UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MAXIAM DEAN,

Plaintiff,

v.

**DECISION AND ORDER**
10-CV-209S(Sr)

THE UNIVERSITY AT BUFFALO SCHOOL OF MEDICINE AND BIOMEDICAL SCIENCES,

THE STATE UNIVERSITY OF NEW YORK,

MICHAEL E. CAIN, M.D., Individually and in his official capacity as Dean of the University at Buffalo School of Medicine and Biomedical Sciences, and

NANCY NIELSEN, M.D., Ph.d., Individually and in her official capacity as Senior Associate Dean of the University at Buffalo School of Medicine and Biomedical Sciences,

Defendants.

---

## I. INTRODUCTION

Plaintiff commenced this action on March 12, 2010, alleging that Defendants violated his rights under the Fourteenth Amendment to the United States Constitution; Title II of the Americans With Disabilities Act of 1990 (the ADA), 42 U.S. C. §§ 12131 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. §§ 1981 and 1983, when they dismissed him from the University at Buffalo School of Medicine and Biomedical Sciences' ("UBMED") M.D. program. Discovery is complete and Defendants have moved for summary judgment dismissal of Plaintiff's complaint under Rule 56 of the

Federal Rules of Civil Procedure. The motion is fully briefed and the Court finds there is no need for oral argument. For the reasons discussed below, Defendants' motion is granted.

## II. BACKGROUND

The University at Buffalo School of Medicine and Biomedical Sciences is an accredited medical school within the State University of New York system. At all relevant times, Defendant Cain was UBMED's Dean, and Defendant Nielsen was its Senior Associate Dean for Medical Education. Cain Decl. ¶ 1; Nielsen Decl. ¶ 1.

UBMED's M.D. program is a full-time, four-year course of study that is divided into two phases. The Year 1 and Year 2 modules/courses comprise the Phase I curriculum, and those in Years 3 and 4 comprise the Phase II curriculum. Plaintiff was admitted to the M.D. program in 2004. Nielsen Decl. ¶ 5; Dean Decl. ¶¶ 1, 3-4. He was dismissed from the program after completing his Phase 1 curriculum.

At all relevant times, UBMED had a written "Academic Status Policies" ("ASP") which sets forth, inter alia, its grading system of: Honors (H), High Satisfactory (S+), Satisfactory (S), Unsatisfactory (U), and Incomplete (I). Nielsen Decl. ¶ 5 Bates 000224-246. Although not included in the ASP, UBMED also uses the designation "Z," which is equivalent to a Satisfactory (S). Def's Stmt. ¶¶ 9-10. To progress from Year 2 to Year 3, a student "must pass all Phase I modules and elective courses." Bates 000234. A student fails to meet academic standards, and may be dismissed from the program, if he or she does not complete the Phase I curriculum within thirty-six months. Id. 000235, 238. A student may also be dismissed if he or she fails any required course/module/clerkship for

a second time. Id. 000238.

Plaintiff completed his Phase I curriculum within the requisite thirty-six month period. He initially received a grade of Unsatisfactory in two courses during his Phase I studies. He retook those courses and received a grade of Satisfactory in each. Dean Decl. ¶¶ 5-7, Exh. B.

In addition to the Phase I curriculum requirements, a student cannot progress from Year 2 to Year 3 until he or she passes Step 1 of the USMLE[1] and the Year 2 Clinical Competency Examination. Bates 000233-234. Plaintiff took and passed his Year 2 Clinical Competency Examination in Spring 2006. Dean Decl. ¶ 82, Exh. V.

Students may not sit for Step 1 of the USMLE until they have passed all their Phase I modules and courses. Bates 000233. Students are allowed only three attempts to pass Step 1, and all attempts must be completed in one academic year exclusive of official (non study) leaves of absence. Id. at 000236. UBMED may dismiss any student who fails Step 1 of the USMLE three times. Id. at 000238. Plaintiff's deadline for successful completion of the Step 1 exam, exclusive of any non-study leaves of absence, was May 31, 2007. Dean Decl. ¶ 12.

On June 21, 2006, Plaintiff made a written request to Dr. Nielsen for a six-week leave of absence to study for the Step 1 exam, stating: "I will sit for the Step 1 on August 18, 2006." Nielsen Decl. ¶ 6, Bates 000086; Dean Decl. ¶ 87.[2] Dr. Nielsen granted the leave request and confirmed that Plaintiff was to attend his Third Year Orientation on July

---

[1] The United States Medical Licensing Examination.

[2] A portion of Plaintiff's Declaration, ¶¶ 82–101, is identified as his opposing statement of facts. Pursuant to Local Rule of Civil Procedure 56(a)(2), Defendants' unopposed facts are deemed admitted.

10, 2006, and begin a Pediatric clerkship on August 21, 2006. after his leave. Id. ¶ 7, Bates 000086. On or about August 16, 2006, Plaintiff took, but failed, the Step 1 exam. Complaint ¶ 40; Docket No. 25-2 ("Dean Depo.") at 52.

By letter dated September 13, 2006, Dr. Nielsen advised Plaintiff that he would be permitted to complete his then-current Pediatrics clerkship, after which he would be placed on a six-week administrative leave of absence. She further advised that he must sit for the Step 1 exam by November 11, 2006 in order to begin the next scheduled clerkship on November 13. Dr. Nielsen requested that Plaintiff notify her in writing if he required more than six weeks to prepare to retake the exam, and reminded him of the one-year time period for his three attempts. Nielsen Decl. ¶ 8, Bates 000084.

On October 31, 2008, Dr. Nielsen received a note from Plaintiff stating that he would like to retake the Step 1 exam on December 23, 2006, rather than November 11, 2006. In a written response, she granted him an additional six-week leave of absence to study, and advised that he was to return to his third year curriculum on January 8, 2007 in a Psychiatry clerkship. Id. ¶ 10, Bates 000082-83. Plaintiff thereafter sought a further extension in order to attend the "Pass Program," a private examination preparation course consisting of lectures and tutoring. Defs' Stmt. ¶ 30. Dr. Nielsen placed Plaintiff on an additional six-week study leave, and his return to the third year curriculum was postponed until February 19, 2007. Nielsen Decl. ¶ 11 Bates 000081.

By certified letter dated January 4, 2007, Dr. Nielsen reminded Plaintiff of the need to retake Step 1 no later than Saturday, February 17, 2007, so he could begin his scheduled clerkship the following Monday. The letter was later returned as unclaimed. Id. ¶ 12 Bates 000332-333. The University eventually was able to contact Plaintiff and, on or

about January 24, 2007, he was read Dr. Nielsen's letter over the phone. Id. Bates 000330. Plaintiff again requested additional leave time, but Dr. Nielsen advised him that he had been afforded many months to prepare, there would be no more extensions, and he must sit for the Step 1 by February 17th or "be dismissed from medical school automatically." Id. ¶13, Bates 001055. Plaintiff characterized this response as unfair, stating his belief that he could delay his second attempt at the Step 1 exam until the end of May by waiving his third opportunity to take it. He then stated that he had experienced depression, stress and anxiety prior to attending the Pass Program, was convinced he could pass the Step 1 with the support and guidance he was receiving, but felt he needed an extra month in the program. Id. Bates 001054-55. Dr. Nielsen suggested that he retake the Step 1 by February 17th, but delay his return to the third year curriculum so as to remain in the Pass Program and continue his studies, at least until he received his test results and knew whether he would need to take the exam a third time. Id. Bates 001054.

Plaintiff took the Step 1 exam on or about February 16, 2007, but failed on this second attempt. Defs' Stmt. ¶ 35. On or about March 20, 2007, Dr. Nielsen advised Plaintiff that he would go on a leave of absence at the end of his then-current clerkship "in order to provide more study time for your third and final Step 1 examination." He was to sit for his final attempt by May 31, 2007, and was reminded that a third failure would result in his dismissal from medical school. Nielsen Decl. ¶ 15, Bates 000078.

In his Complaint, Plaintiff alleges that he became disabled sometime after his second attempt at the Step 1 exam. Compl. ¶¶ 40-42. On May 4, 2007, Plaintiff presented at the University's Counseling Services for a crisis evaluation session where he reported various depression-related symptoms, such as disrupted sleep, fatigue, and difficulty

concentrating and maintaining focus. Dean Decl. ¶¶ 19-20, Ex. J. The psychologist he met with, Andrea Greenwood, Ph.D., recommended he seek assessment for medication to treat the symptoms of depression, and schedule a further appointment with her for a more comprehensive psychological assessment. Id. That same day, Plaintiff saw Dwight Lewis, M.D., who offered to prescribe medication. Plaintiff declined, indicating he wanted to first try counseling only. Dr. Lewis provided Plaintiff an excuse slip recommending that he take a three-month leave of absence from medical school due to situational depression. Plaintiff delivered the document to UBMED the same day. Id. ¶¶ 21-23, Exhs. D, K; Defs' Stmt. ¶ 39. Dr. Nielsen informed Plaintiff, by letter and email, that Dr. Lewis's excuse slip did not contain sufficient information to extend him leave. Nielsen Decl. Bates 000070; Dean Decl., Exh. F-H.

On May 17, 2007, when Plaintiff again met with Dr. Greenwood, she prepared a letter at his request advising Dr. Nielsen and the University Leave of Absence Committee about his reported symptoms and her recommendations. Dean Decl. Exh. J. On May 18, 2007, Plaintiff saw Dr. Lewis, indicated he was receptive to medication, and was prescribed Lexapro, an anti-depressant. On May 21, 2007, Dr. Lewis wrote to the Leave of Absence Committee and provided additional information as a follow up to his excuse slip, noting that Plaintiff's symptoms "were acutely exacerbated by a recent relationship discord." Defs' Stmt. ¶ 43; Dean Decl. Exhs. I, K. Both Drs. Greenwood and Lewis recommended a leave of absence to allow Plaintiff time to return to healthy/proper functioning. Neither provided a recommendation as to the leave duration. Dean Decl. Exhs. J, K. In Plaintiff's own letter to the Leave of Absence Committee, also dated May 21, 2007, he described the symptoms he had experienced in the past two months and requested three months' leave. Dean Decl.

Exh. I. The following day, the Committee recommended that Plaintiff be granted a leave of absence until June 30, 2007, approximately six weeks after he started on Lexapro, to permit his mental health therapy to begin working. The Committee was of the view that Plaintiff should not be granted leave for additional "study time," and that no further leaves be granted after June 30. Id. Exh. L. One day later, Dr. Cain, UBMED's Dean, accepted the Committee's recommendation, extended Plaintiff's deadline to retake the Step 1 exam to June 30, 2007, and reiterated that "[n]o further delays whatsoever will be granted." Id. Exh. N.

In Dr. Greenwood's May 17 letter to the Committee, she indicated that Plaintiff would be followed up by Dr. Warren, the Counseling Services' consulting psychiatrist, on May 31, 2007. Id. Exh. J. Following that appointment, Dr. Warren wrote a letter confirming that Plaintiff had started on Lexapro on May 18. He went on to note that Plaintiff had experienced some mild improvement, but continued to have signs and symptoms of major depression, and expressed his support for a leave of absence that would allow the prescribed treatment to become effective; a period of six to eight weeks. Id. Exh. O. By letter dated June 1, 2007, Plaintiff provided Dr. Cain a copy of Dr. Warren's letter and requested a three month leave of absence so he could "focus on preparing for the retake." Id. Exh. P. In short, he sought the full medical leave recommended by Dr. Warren, plus additional study time. Dr. Cain extended the deadline for Plaintiff to take the Step 1 exam to July 28, 2007–i.e., a period of just over ten weeks after Plaintiff began taking Lexapro. Id. Exh. Q.

Plaintiff alleges that he regained normal functioning in mid-July. Compl. ¶ 90. On or about July 23, 2007, an individual from the Pass Program, Dr. Francis, left a voicemail at

Dr. Cain's office on Plaintiff's behalf. The following day, Dr. Nielsen sent Plaintiff an email advising that due to privacy regulations, "the school will not speak to anyone but a student about that student," and would not be returning Dr. Francis's call. Defs' Stmt. ¶¶ 58-59, Bates 000277. The record contains no indication that Plaintiff responded to the email or otherwise contacted UBMED prior to his exam deadline. He did not sit for his third attempt at the Step 1 exam on or before July 28, 2007. Id. ¶ 60.

By letter dated August 15, 2007, Dr. Nielsen informed Plaintiff that he was administratively dismissed from the M.D. program. She further advised that he could appeal the dismissal under the process contained in the ASP, and that she and others were available "to respond to your questions and review the appeal process with you." Id. Exh. R. Plaintiff did not appeal the dismissal. Id. ¶ 61. In his Complaint, Plaintiff contends, inter alia, that Defendants should have provided him at least two months' study time after he resumed effective functioning so he could properly prepare for his final attempt at the Step 1 exam. Compl. ¶ 107.

In his five claims for relief, Plaintiff alleges Defendants: (1) failed to provide necessary modifications to its academic requirements and otherwise discriminated against him in violation of the Rehabilitation Act, (2) dismissed him from the M.D. program because of his disability in violation of the ADA, (3) stigmatized Plaintiff and harmed his ability to pursue his chosen profession, thereby depriving him of due process, (4) discriminated and retaliated against him based on race in violation of the Civil Rights Act, and (5) deprived him of equal protection in violation of the Fourteenth Amendment. He seeks reinstatement to the M.D. program and monetary relief.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**B. Title II and Section 504**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). In response to Defendants' motion, Plaintiff concedes that neither the ADA nor the Rehabilitation Act provides for individual capacity suits against state officials and, so, all claims brought against Drs. Cain and Nielsen in their individual capacities must be dismissed. 42 U.S.C. § 12132; 29 U.S.C. § 794.

"[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998). To establish a violation under either disability act, a plaintiff must demonstrate that (1) he is a qualified individual with a disability, (2) the defendant(s) are subject to the Act(s), and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant(s) because of his disability. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (courts generally treat claims under the two statutes identically); Shepherd v. Buffalo Psychiatric Ctr., 05-CV-563, No. 2009 U.S. Dist. LEXIS 116722, at *6-7 (Dec. 15, 2009).

There is one point at which these acts diverge. In this Circuit, a plaintiff seeking monetary damages to remedy an alleged Title II violation must show "not only that there was a violation, but that such violation was motivated by either discriminatory animus or ill will stemming from plaintiff's disability." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 89 (2d Cir. 2004); see also, Askins v. New York City Transit, No. 11-CV-6371, 2013 U.S. Dist. LEXIS 5340, at *13-14 (S.D.N.Y. Jan. 8, 2013) (Eleventh Amendment requires showing of discriminatory animus or ill will in Title II suits against state entities). In contrast, the recovery of monetary damages under Section 504 requires only a showing that the violation resulted from "deliberate indifference" to the rights of the disabled secured by the Act. Powell, 364 F.3d at 89 (citation omitted).

Here, Defendants assume that Plaintiff has a "qualifying disability."[3] (Docket No. 25 at 5.) In addition, they apparently concede the University is subject to the provisions of both acts. Thus, the Court need only address the third element.

To deny an opportunity to participate in a program means "only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." St. Johnsbury Academy v. D.H., 240 F.3d 163, 173 (2d Cir. 2001). A defendant discriminates within the meaning of the acts when it fails to make a reasonable accommodation that would permit the disabled individual to have access to, and take meaningful part in, public services. Powell, 364 F.3d at 85; see also 42 U.S.C. § 12112(b)(5)(A) (discrimination includes "not making reasonable accommodations to the

[3] Defendants do not address whether Plaintiff is a "qualified individual with a disability" or "otherwise qualified"—i.e., able to meet all of the M.D. program's requirements in spite of his handicap. See St. Johnsbury Academy, 240 F.3d at 173. The Court assumes this point is conceded for purposes of the instant motion.

known physical or mental limitations of an otherwise qualified individual with a disability”). "A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." Henrietta D., 331 F.3d at 282 (quoting Alexander v. Choate, 469 U.S. 287, 301, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985)).

Plaintiff maintains that Defendants failed to reasonably accommodate him when they denied his request for an additional leave of absence for study purposes, beyond the medical leave necessary to return to normal functioning. He has produced no proof that Defendants’ decision to grant him medical leave, but not additional study leave, was on account of his disability, or that he was denied participation in the M.D. program because of a disability.

Plaintiff first notified Defendants that he was diagnosed with situational depression on May 4, 2007. However, he did not present any information regarding his symptoms or their possible impact on academic performance until May 21, 2007. This was just ten days before his deadline for a final retake of the Step 1 exam. Once he provided information from his treating sources, the Leave Committee acted on Plaintiff’s request in one day, and Dr. Cain reviewed and accepted the Committee’s recommendation one day thereafter. The Committee limited its recommendation to medical leave only. Though it did not explain its determination that no additional study time should be granted, the Court notes that Plaintiff already had spent a year studying and preparing for the Step 1 exam. Plaintiff does not allege, nor does the record suggest, that he suffered from a mental disability during that period, prior to the acute exacerbation of symptoms described by Plaintiff and noted by Dr. Lewis.

To the extent Plaintiff suggests the initial six week leave he was granted was not reasonable, no doctor had, at that point, made a specific recommendation as to leave duration.[4] Moreover, as soon as Dr. Cain received information from Dr. Warren indicating a six to eight week time period for effective treatment, he extended the six week leave already granted to just over ten weeks. Plaintiff concedes in his Complaint and Declaration that he had, in fact, returned to normal functioning by mid-July.

Under UBMED's policies, able-bodied students must take and pass the Step 1 exam within one academic year. Plaintiff came forward with his request for leave as his year was about to expire. Defendants granted him leave beyond the one academic year limit to allow him time to return to normal functioning. Plaintiff has not offered any evidence indicating the leave he was granted failed to level the playing field or treat him in an even-handed manner with regard to the Step 1 exam.[5]

Beyond that, there is evidence that UBMED fully supported Plaintiff's efforts to succeed in its academic program and on the Step 1 exam. There are numerous letters and emails by Dr. Nielsen, dated both before and after May 4, 2007, in which she sought to expedite Plaintiff's medical leave request, continued to prepare for his return to the M.D. program, provided him with various options for resuming his course work upon retaking the Step 1 exam, and sought to make other resources available to him.

---

[4] In his excuse slip, Dr. Lewis did recommend a three-month leave. However, this was before Plaintiff agreed to try medication. Thereafter, Dr. Lewis's recommendation was for leave sufficient to allow time for Plaintiff's return to proper functioning. Dean Decl. Exh. K.

[5] The Court acknowledges that Plaintiff is of the opinion that even-handedness required he be given two months' study time after the symptoms of his short-term depression were ameliorated, in addition to the year he spent studying prior to his medical leave. The Court does not agree that Defendants' leave decision provided an insufficient accommodation or otherwise disadvantaged Plaintiff as compared to able-bodied students required to complete all attempts at the Step 1 exam within one academic year.

In sum, there is no plausible inference that Defendants discriminated against Plaintiff or deprived him of an opportunity or benefit because of a disability such that a reasonable jury could find in his favor.

**C. Eleventh Amendment Immunity**

As previously noted, Plaintiff also claims he was deprived of constitutional rights in violation of 42 U.S.C. § 1983, and discriminated against because of his race in violation of 42 U.S.C. § 1981. Defendants seek dismissal of these claims as to the State University and UBMED on Eleventh Amendment immunity grounds.

It is well-settled that Congress, in passing 42 U.S.C. § 1983, did not abrogate the States' immunity under the Eleventh Amendment. See Dube v. State Univ. of New York, 900 F.2d 587, 594 (2d Cir. 1990); Casino v. StonyBrook University Medical Center, No. 13 Civ. 6357, 2014 U.S. Dist. LEXIS 10408, 2014 WL 317368, at *4 (E.D.N.Y. Jan. 27, 2014) The same is true for claims under 42 U.S.C. § 1981. Buckley v. New York, 959 F. Supp. 2d 282, 294 (E.D.N.Y. 2013) (finding claims against SUNY and individual defendants in their official capacities barred by precluded by Eleventh Amendment immunity).

The Court further finds, sua sponte, that Plaintiff’s claims must fail as a matter of law to the extent he seeks monetary damages against Drs. Cain and Nielsen in their official capacities. Although Defendants did not raise sovereign immunity with respect to the official capacity claims, Plaintiff implicitly concedes such claims are barred. Specifically, he urges that his official capacity claims under §§ 1981 and 1983 stand to the extent he is seeking prospective nonmonetary relief. (Docket No. 30 at 12-13.) Of course, there is no bar to Plaintiff’s claims for monetary damages against Drs. Cain and Nielsen in their individual capacities.

## D. Due Process

To be entitled to the procedural protections of the Fourteenth Amendment, Plaintiff must demonstrate that his dismissal from the M.D. program deprived him of either a “liberty interest” or “property interest.” He contends he was deprived of both. Portions of the parties’ respective briefs are devoted to arguments over whether the allegations in the Complaint implicate no constitutionally protected interest, a liberty interest only, or both a liberty and property interest.[6] This is an issue the Court need not consider. Even assuming the existence of a constitutionally protected interest, the Court finds Plaintiff was afforded such due process as is required by the Fourteenth Amendment.

Plaintiff was dismissed after he did not sit for his third attempt at the Step 1 exam by July 28, 2007. According to Defendants, Plaintiff’s dismissal was for his failure to meet all UBMED requirements for promotion from Year 2 to Year 3 within the specified time period, which in his case included additional time for medical leave. Plaintiff, on the other hand, characterizes the dismissal as discipline for his perceived insubordination in defying the July 28, 2007 deadline. There simply is nothing in the record to support Plaintiff’s view.

Plaintiff made numerous leave requests over the course of more than one year, generally very near a deadline by which he was to sit for the Step 1 exam for the second or third time. Plaintiff was not subjected to any consequence or discipline for these delays. On each occasion, Defendants set a new deadline, and reminded Plaintiff of the ultimate, one-year deadline for meeting all requirements. After the July 28, 2007 deadline was set,

[6] In opposition to Defendants’ motion, Plaintiff appears to abandon his liberty interest “stigma-plus” claim in favor of a claim based on his purported property interest in continued enrollment in the M.D. program. (Docket No. 30 at 7.)

Plaintiff made no further requests for leave, although he knew that date was beyond the one year deadline applicable to able-bodied students. By not sitting for the Step 1 exam on or before the extended deadline, he failed to meet the necessary prerequisites to advance to the Year 3 curriculum. In short, the dismissal is best characterized as academic, not disciplinary.

The touchstones of due process are notice and an opportunity to be heard. Mullanev. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L.Ed. 865 (1950). In Board of Curators of University of Missouri v. Horowitz, the Supreme Court was asked to consider “what procedures must be accorded to a student at a state educational institution whose dismissal may constitute a deprivation of ‘liberty’ or ‘property’ within the meaning of the Fourteenth Amendment.” 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978). The Court distinguished between dismissals or suspensions for disciplinary reasons and those for failing to meet academic or curriculum standards.

Referring to an earlier case involving a disciplinary suspension,[7] the Court confirmed that disciplinary actions have a sufficient resemblance to traditional judicial and administrative factfinding to call for a “hearing” before the relevant school body. Id. at 88-89. Even in that context, however, the Supreme Court declined to require a formal hearing. It concluded that, in the case of a disciplinary dismissal, a student must be given notice of the charges and, if he or she denies them, an explanation of the evidence and an opportunity to present his or her side of the story in an “informal give and take.” Id. at 85-86.

The Court contrasted the subjective and evaluative nature of academic decisions, and concluded due process requirements must necessarily be less stringent in this context.

---

[7] Goss v. Lopez, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).

Specifically, due process with regard to academic decision-making requires only that: (1) the student is made aware school's dissatisfaction with or expectations for progress, including the possible impact on continued enrollment, and (2) the ultimate decision to dismiss is careful and deliberate. There is no hearing requirement. Id. at 84-85.

There can be no dispute that Plaintiff was repeatedly notified of the need to meet all prerequisites for promotion to Year 3 and that a failure to timely do so would result in his dismissal from the program. His dismissal, though academic in nature, was more ministerial than evaluative. He simply failed to do what was required of all students in order to progress to the next phase of the program. In these circumstances, this Court is of the view that Defendants' care and deliberateness is sufficiently demonstrated by Dr. Nielsen's continuous communication with Plaintiff regarding program requirements, the multiple grants of study leave, and the grant of medical leave. Defendants did not act without first supporting Plaintiff's efforts, and only after all time for compliance under UBMED's policies had expired.[8]

Because Plaintiff has failed to raise a triable issue of fact, summary judgment is granted as to this claim.

**E. Race Discrimination**

Plaintiff, who did not identify himself as a racial minority in his Complaint, alleges that Drs. Cain and Nielsen discriminated against him based on race, color, and national origin,[9] and denied him equal contract rights with regard to his continued enrollment in UBMED's M.D.

---

[8] Plaintiff also argues that due process was violated because Defendants did not follow the process outlined in the ASP for dismissal. Even assuming that is the case, such a claim implicates a contractual breach, not a constitutional violation. Moreover, the ASP includes an appeal process, of which Plaintiff was notified, which permits a student to challenge whether an action or decision was based on appropriate review. Plaintiff did not avail himself of this process.

[9] The Complaint also baldly alleges retaliation under § 1981, but contains no supporting facts. Furthermore, Plaintiff's submissions in opposition to Defendants' motion do not identify any basis for a retaliation claim.

program. In moving for summary judgment, Defendants identify Plaintiff as African-American.

Under § 1981, a plaintiff is entitled to relief "when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). At the summary judgment stage, courts apply the burden-shifting framework set forth in McDonnell Douglas v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to claims arising under § 1981 where, as here, the plaintiff relies on indirect evidence of discriminatory intent. See Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010). Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating: (1) membership in a protected class; (2) that he was impaired by the defendant in the making or enforcing of a contract; and (3) circumstances surrounding that impairment give rise to an inference of discrimination. See Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).

The first element is conceded. As for the second element, Plaintiff alleges, in conclusory fashion, that "an implied contract exists between a student and the State University." Compl. §§ 124, 134. Plaintiff has provided no statutory or decisional support for this conclusion and, thus, fails to make his prima facie showing under § 1981. Even were the Court to assume the existence of a contract, Plaintiff has not presented evidence giving rise to an inference that Defendants were motivated by race-based discrimination. As such, summary judgment in Defendants' favor is warranted.

Alternatively, had Plaintiff met his de minimus, prima facie burden, Defendants have come forth with a legitimate, nondiscriminatory reason for dismissing Plaintiff from the M.D. program—to wit, Plaintiff's documented failure to complete all of the prerequisites for

promotion to Phase II in the requisite time frame. This reason, if accepted by the trier of fact, would support a finding that unlawful discrimination was not the cause of Plaintiff's dismissal.

Once a legitimate nondiscriminatory reason for the challenged action is proffered, "the presumption of discrimination arising with the establishment of the prima facie case drops from the picture," and the burden shifts back to the plaintiff to come forward with evidence that the defendant's reason is a mere pretext for actual discrimination. Weisnstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). Here, Plaintiff simply asserts that Defendants have not met their burden of articulating a legitimate, nondiscriminatory reason, and so does not attempt to make the requisite showing of pretext. Thus, even assuming Plaintiff had established his prima facie case, summary judgment would be granted here.

**F. Equal Protection**

"The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike." Brown v. City of Syracuse, 673 F.3d 141, 151 (2012) (internal quotation marks omitted).In his final cause of action, Plaintiff alleges Drs. Cain and Nielsen deprived him equal protection by treating him less favorable than Caucasian students, and black students born outside the United States, with regard to leave requests, dismissal from the M.D. program, and access to meaningful appeal remedies. Plaintiff has not come forward with evidence of any similarly situated individual who received more favorable treatment with regard to leave, dismissal, or appeal rights. In his deposition, Plaintiff did testify that a Jamaican student told him she received financial assistance from the University's Dean of Minority Affairs to attend the

Pass Program, while he did not. Dean Depo. at 87-89. He went on to concede, however, that unlike the Jamaican student, he had never requested financial assistance for that purpose. Id. at 89. In short, Plaintiff has not established a prima facie case. Even had he done so, Defendants have come forward with a legitimate nondiscriminatory reason for its decision to dismiss Plaintiff from the program. They also have come forward with evidence that Plaintiff was afforded the same opportunities as all other students to complete the prerequisites for promotion, was accommodated during his period of disability, and was expressly afforded the right to appeal the dismissal. On these facts, no reasonable jury could conclude that Plaintiff was denied equal protection.

## IV. CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is granted in its entirety and this case is dismissed.

## V. ORDER

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 24) is GRANTED; and

FURTHER, that the Clerk of Court is directed to take the steps necessary to close this case.

SO ORDERED.

Dated: March 31, 2014
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court